IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| HALEY SUE OWEN HOOPER, <br><br> Plaintiff, <br><br><br> vs. <br><br><br> CORDELL PEARSON, a Task Force Member, ROGER LARSON, a Task Force Member, CLARK THOMAS, a Task Force Member, ALLEN PEARSON, a Task Force Member, PHIL BARNEY, Sevier County Sheriff, CENTRAL UTAH NARCOTICS TASK FORCE, and SEVIER COUNTY, <br><br> Defendants. | **MEMORANDUM OPINION AND ORDER** <br><br><br><br> Case No. 2:08cv871 <br> Judge Dee Benson |

Plaintiff Haley Sue Owen Hooper ("Owen")[1] brings this civil rights suit under 42 U.S.C.

§ 1983 claiming that defendants are liable for damages resulting from violations of her Fourth

and Fourteenth Amendment rights. (Dkt. No. 3, Complaint.) Before the court are Defendant

Roger Larson's Motion for Summary Judgment (Dkt. No. 30) and Defendants Cordell Pearson,

Clark Thomas, Allen Pearson, Phil Barney, the Central Utah Narcotics Task Force, and Sevier

---

[1]When the relevant events transpired, plaintiff's name was Haley Sue Owen. Therefore, for purposes of this case, plaintiff is referred to as Owen.

1

County's Motion for Summary Judgment. (Dkt. No. 33.) The court heard oral argument on the motions on April 23, 2010, and allowed limited supplemental briefing following oral argument.[2] Having considered the parties' arguments, memoranda, and the relevant law, the court enters the following Memorandum Opinion and Order.

## FACTUAL BACKGROUND

On December 27, 2004, members of the Central Utah Narcotics Task Force were involved in an investigation of Phillip Smith. (C. Pearson Dep. 12.) The task force had been informed that Smith was in the area, and that he was wanted by the West Valley Police on a $25,000 arrest warrant for Distribution of a Controlled Substance, and also wanted for assault on a peace officer and burglary out of Salina, Utah. (Thomas Dep. 17.) Cordell Pearson was the commander of the task force at the time. (C. Pearson Dep. 4-5.) Other task force members involved in the investigation included detectives Roger Larsen and Clark Thomas.

In their efforts to locate Smith, task force detectives Thomas and Larson went to the residence of Cami Hampton. Ms. Hampton advised Thomas and Larson that she had given Smith permission to take her vehicle – a white Thunderbird – and that Smith was going to the Owen residence, located just north of Salina in the Redmond area. (Larson Dep. 46-47; Thomas

---

[2]Defendants were allowed to file supplemental reply memoranda as a result of the written statement in plaintiff's opposition memoranda which expressly provided that she was "willing to stipulate to dismiss . . . named defendants in their individual capacities." (Pl.'s Mem. In Opp'n at ii.) At oral argument, however, counsel for plaintiff stated that the "stipulation" was a mistake, and plaintiff did in fact intend to pursue individual claims against defendants Cordell Pearson, Clark Thomas and Roger Larson. (Tr. at 21-23.) The court allowed plaintiff's counsel to withdraw the written stipulation, and provided defendants the opportunity to submit supplemental reply memoranda to address matters that were not briefed in reliance on the plaintiff's now-withdrawn stipulation. (Tr. at 109.)

Dep. 18.)  Upon receipt of this information, detectives Thomas and Larson drove to the Owen residence.  (Thomas Dep. 18; Larson Dep. 46.)

When the detectives arrived at the Owen residence they observed Ms. Hampton's white Thunderbird.  Detectives Thomas and Larson advised Commander Pearson of Smith's location, and shortly thereafter Commander Pearson met Thomas and Larson near the Owen residence. Detectives Thomas and Larson were together in an unmarked truck, dressed in plain clothes. (Larson Dep. 31.)  Commander Pearson was also dressed in plain clothes and driving an unmarked truck. (Pearson Dep. 13.)

The task force decided that they would wait for Smith to leave the residence in the white Thunderbird and then have a uniformed officer stop the vehicle.  The task force detectives stationed their vehicle so they could hold surveillance on both the residence and the white Thunderbird.  (Thomas Dep. 18-19.)  Commander Pearson contacted Sevier County Deputy Bryant Johnson who was nearby, in uniform, and in a marked patrol car.  Deputy Johnson was advised of the plan and instructed to stop the vehicle once it left the residence.  (Pearson Dep. 13; Johnson Dep. 13.)

After approximately five minutes of surveillance, detectives Thomas and Larson observed the white Thunderbird drive away from the Owen residence.  (Larson Dep. 46.) Deputy Johnson was advised of the vehicle's departure and began pursuing the vehicle.  A traffic stop of the white Thunderbird could have been based on an equipment violation due to a broken mirror, but the main purpose of the stop was "to arrest Smith on the outstanding warrant." (Thomas Dep. 20.)  Within a mile of the residence, Deputy Johnson activated his lights and the

Thunderbird pulled to the side of the road. Deputy Johnson pulled up directly behind the vehicle. From that perspective all he could see was a person sitting in the driver's seat. Detective Thomas, accompanied by detective Larson, pulled behind Deputy Johnson's patrol car. Commander Pearson pulled up directly behind detectives Thomas and Larson.

Deputy Johnson exited his patrol car, approached the white Thunderbird on the driver's side, and shouted "let's see your hands, let's see your hands." (County Defs.' Ex. J, video.) As he approached the vehicle, he observed that the driver of the vehicle was a female, later identified as the plaintiff, Haley Sue Owen. Deputy Johnson asked the driver to step out of the car and directed her to stand at the back of the Thunderbird. (County Defs.' Ex. J, video.) When asked for her name, she identified herself only as "Haley." Deputy Johnson asked if she had any weapons and he briefly lifted the bottom of her jacket to check her waistline for weapons. (Id.) Deputy Johnson then directed Owen to detectives Thomas and Larsen, who were standing at the front of detective Thomas' truck. (County Defs.' Ex. J, video.) Detective Thomas immediately asked, "Where's Smith?" (Id.) Deputy Johnson then returned to search the vehicle with Commander Pearson.

While Deputy Johnson and Commander Pearson searched the vehicle, Detective Thomas questioned Owen, in the presence of Detective Larson, for approximately three to five minutes regarding the whereabouts of Smith. (Larson Dep. 44; Thomas Dep. 27.) When asked about Smith, Owen lied to the detectives to protect Smith from arrest. (Owen Dep. 117, 118.) Owen told Detective Thomas that she had dropped off Smith, but provided inconsistent stories as to the precise location where she had left him. (Thomas Dep. 28.) Recognizing the inconsistencies,

Detective Thomas said, "don't lie to me," and told Owen he thought her story was "bullshit." (County Defs.' Ex. J, video; Thomas Dep. 28.)  Owen was "loud" and "profane" throughout the conversation.  (Thomas Dep. 28-29; Larson Dep. 43.)  When asked for her name, Owen responded, "fuck you" and refused to provide it.  (Larsen Dep. 39; Thomas Dep. 27.)

During this encounter, the detectives observed Owen for signs of drug use or intoxication.  (Thomas Dep. 28.)  Based on Owen's behavior and demeanor, both detectives independently concluded that Owen was under the influence of a central nervous system stimulant.  (Larson Dep. 44, 100; Thomas Dep. 34.)  Owen's eyes were darting back and forth and she showed signs of "extreme bruxism" (an involuntary tightening of the jaw muscles), involuntary facial twitches, shifting her weight back and forth, and fidgeting.  (Thomas Dep. 34, 54.)  Detective Thomas asked Owen if she would submit to some field sobriety tests, to which Owen responded, "suck my cock or lick my asshole."  (Thomas Dep. 29.)  Detective Thomas understood Owen's response to be a refusal, and at that point he informed Owen that she was under arrest for DUI.  (Thomas Dep. 30.)

While detectives Thomas and Larson were questioning Owen, Commander Pearson, assisted by Deputy Johnson, searched the white Thunderbird.  Commander Pearson believed the search was justified because he knew the car did not belong to Owen, and the task force had previously talked with the vehicle owner, Cami Hampton, who identified only Smith as an authorized driver.  (C. Pearson Dep. 16; Thomas Dep.18; Larson Dep. 46-47.)  Moreover, the officers were looking for Smith, who they believed "could have been in the trunk [or] could have been laying [on] the floorboard."  (Larson at 87, Thomas at 74.)  Smith was not found within the

vehicle, but the officers did find a weapon (a club) under the driver's seat. (Johnson Dep. 28.)

Following the roadside search of the Thunderbird and the arrest of Owen, Deputy Johnson transported Owen to the Sevier County Jail, approximately 22 miles away. (Johnson Dep. 29.) Owen remained belligerent upon her arrival at the jail. She refused to provide personal information, and "it was pretty much fuck you to everything anyone said to her." (Larson Dep. 88.) Owen claims that Deputy Johnson told the booking desk "that the task force ordered [her] strip searched." (Owen Dep. 50.) Owen claims that an unnamed female employee took her into a room, strip searched her, and put her in a cell. (Owen Dep. 54.) However, Deputy Johnson does not remember telling anyone at the jail that the task force ordered a strip search, he was not involved in any strip search at the jail, and a strip search was not part of the booking procedures. (Johnson Dep. 32, 35-36.) Additionally, task force detective Larson did not request a strip search of Owen. He never heard any member of the task force request a strip search, nor did he know whether Owen was strip searched at the jail. (Larson Dep. 92.)

In the interim, while Deputy Johnson was transporting and booking Owen into jail, the task force detectives continued to pursue Smith and returned to the Owen residence to maintain surveillance. (Thomas Dep. 30-31.) Commander Pearson received a telephone call from a narcotics officer in Salt Lake indicating that Smith had called, said he knew the detectives were waiting for him, and he would turn himself in. (Larson Dep. 50.) Detectives Larson and Thomas waited for approximately 15 to 20 minutes outside the Owen residence before Smith exited the residence and surrendered. Smith was arrested and transported to the jail by detectives Thomas and Larson. (Larson Dep. 50-51.)

Detectives Thomas and Larson arrived at the jail with Smith approximately one-half hour to one hour after Owen was booked and placed in a cell. (Larson Dep. 51.) After arriving at the jail, Detective Larson approached Owen's cell and said, "you've been arrested for DUI and I need to get a urine sample from you." Owen responded, "fuck you." (Larson Dep. 53.) Detective Larson repeated, "no, you know, we have to get a urine," and Owen again responded, "fuck you." Larson then informed Owen, "well, I'll have to write a search warrant, and we'll have to do it that way." Once again, Owen responded, "fuck you." (Larson Dep. 53.) Owen refused to provide a urine sample because she knew she was under the influence of methamphetamine and marijuana, and she knew that if tested, her urine would show "dirty" for drugs and she would be convicted. (Owen Dep. 121.)

Given Owen's repeated refusal to provide a urine sample, Detective Larson drafted an affidavit for a warrant authorizing "the seizure of bodily fluids" from Owen. (Larson Dep. 53; Aff. for Search Warrant, Bates No. HOOP00231.) Judge David L. Mower signed the warrant and Detective Larson returned to the jail where he held the warrant up to the window in Owen's cell to show her he had a bodily fluids warrant. (Larson Dep. 80.) Detective Larson told Owen, "I've got a warrant for your urine," and "you really don't have a choice . . . this is a warrant from a judge, you have to provide a urine sample." (Larson Dep. 80.) Detective Larsen tried to talk Owen into giving a voluntary urine sample, and cautioned her that if she did not comply they would have to use a catheter. (Larsen Dep. 89.) Owen responded, "fuck you . . . you'll have to take it." (Larson Dep. 80, 89.)

Detective Larson called Commander Pearson, telling him that Owen refused to give a

urine sample.  Commander Pearson told Larson, "do not do anything until you go back to Judge Mower and ask him what he wants us to do."  (C. Pearson Dep. 26; Larson Dep. 81.)  Detective Larson returned to the court and told the court clerk that he needed to speak with Judge Mower because Owen would not comply with the warrant.  (Larson Dep. 81.)  The clerk told Detective Larson that Judge Mower had gone for the day.  The clerk tried three different phone numbers before finally reaching Judge Mower on the phone.  (Larson Dep. 81.)  Detective Larson heard the clerk explain to Judge Mower that Owen refused to cooperate with the warrant and Detective Larson needed to know if they should use a catheter to get a urine sample.  (Larson Dep. 81.)  After concluding the telephone conversation with Judge Mower, the court clerk told Detective Larson to go ahead and get a certified medical person to catheterize Owen.  (Larson Dep. 82.)  The clerk told Larson that Judge Mower said the warrant itself provided authorization to take the urine by catheterization if necessary, but that it should be done by someone who was certified.  (Larson Dep. 82, 91.)

Detective Larson returned to the jail and informed the jail personnel that Judge Mower authorized the use of a catheter by a nurse or other certified person.  (Larson Dep. 82, 106.)  Sevier County Jail Lieutenant Pam Bigelow called the jail nurse, Beth Beutler, and informed her that officers were bringing an inmate to medical and needed nurse Beutler to do a catheterization.  (Beutler Dep. 9.)

Detective Larson and Sevier County Jail Sergeant Allen Pearson retrieved Owen from her cell.  Owen refused to walk and would not go willingly.  Accordingly, each officer took one of Owen's arms and carried her to the nurse's room as she was kicking and screaming, "fuck

you, mother fuckers." (Bigelow Dep. 47; A. Pearson Dep. 22.)  Upon arriving in medical, nurse Beutler asked to see the warrant and understood that she was "commanded to obtain" a urine sample from Owen, even if she had to compel Owen to do so.  (Beutler Dep. 24.)  Nurse Beutler instructed the officers to bring Owen to the exam table.  (Beutler Dep. 10.)

Owen repeatedly tried to kick nurse Beutler and the medical equipment, and tried to push nurse Beutler out of the way.  (Beutler Dep. 10-11.)  Because of Owen's behavior, the officers had to hold her down in order to prevent her from hurting herself or others in the room. (Bigelow Dep. 50, 51.)  It was also necessary for Owen to be restrained so that nurse Beutler could "see the job and to do it right without introducing any bacteria."  (Beutler Dep. 10.)  During this time Owen continued to yell things such as, "fuck you, you can't do this, get away from me, let go of me, you're bastards, you're bitches.  I'll get you."  (Beutler Dep. 25.)

Sergeant Allen Pearson, Detective Roger Larson and Sergeant Troy Morgan were present and helped to restrain Owen. (Larson Dep. 84; A. Pearson Dep. 22.)  In addition, Lieutenant Pam Bigelow was in the room to assist.  Lieutenant Bigelow stood at the exam table opposite nurse Beutler, to be a witness and in order to have two females doing the procedure so that it was "female-to-female."  (Beutler Dep. 10.)  Nurse Beutler and Lieutenant Bigelow stood on either side and removed Owen's pants and underwear from one leg only to expose the area necessary to obtain a sample.  (Beutler Dep. 10.)  The male officers tried to turn away from the procedure while holding Owen down so as to give Owen as much privacy as possible.  (Beutler Dep. 11.)  Additionally, nurse Beutler tried to drape a sheet over the top of Owen to give privacy, but it did not stay in place because Owen was struggling so hard to resist the procedure.  (Beutler Dep.

11.)

With the officers holding Owen and with Lieutenant Bigelow's assistance, nurse Beutler cleaned and prepped the area, slipped in the catheter, and withdrew a sufficient amount of urine. Lieutenant Bigelow promptly placed the urine sample into evidence for testing. Owen's urine tested positive for methamphetamine and THC (marijuana). (Bigelow Dep. 50.) As a result, criminal charges were filed against Owen in Utah's Sixth Judicial District Court in Sevier County. The criminal charges were dismissed, however, after Judge K.L. McIff granted Owen's motion to suppress the results of the forced catheterization. (Compl. Ex. 1.)

Thereafter, on November 12, 2008, Owen filed this § 1983 action against numerous individual officers as well as the Central Utah Narcotics Task Force, Millard County, Sanpete County, and Sevier County. Owen's complaint asserted the following seven causes of action: (1) unlawful search and seizure; (2) illegal detention and arrest; (3) excessive force via catheterization; (4) failure to intervene; (5) failure to train; (6) unconstitutional policy, custom or practice relating to strip search; and (7) malicious prosecution. (Dkt. No. 3, Complaint.) However, since the initial filing, both the number of claims and the number of defendants have been reduced. Owen has stipulated to the dismissal of her fourth cause of action for failure to intervene and all punitive damages claims. (Dkt. No. 19.) Similarly, Owen has stipulated to the outright dismissal of defendants Bryant Johnson, Beth Beutler, Pam Bigelow, Sanpete County and Millard County, and she has stipulated to the dismissal of Sheriff Phil Barney and Allen Pearson in their individual capacities. (Oral Argument Tr. at 21-23; Dkt. No. 19.) The remaining defendants can be roughly divided into two groups: (1) the "county defendants,"

which include the Central Utah Narcotics Task Force, Sevier County, Sevier County Sheriff Phil

Barney in his official capacity, and Sergeant Allen Pearson in his official capacity; and (2) the

"individual defendants" – officers that have been named in both their individual and official

capacities – which include Cordell Pearson, Clark Thomas and Roger Larson. These remaining

defendants have moved for summary judgment on all of Owen's claims on the basis that they are

entitled to qualified immunity.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, . . . show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court must view

the evidence, and draw reasonable inferences from that evidence, in the light most favorable to the

non-moving party. Cummings v. Norton, 393 F.3d 1186, 1189 (10th Cir. 2005). The nonmoving

party may not, however, "rest on mere allegations or denials of [its] pleading, but must set forth

specific facts showing there is a genuine issue for trial." Anderson v. Libberty Lobby, 477 U.S.

242, 256 (1986). "The mere existence of a scintilla of evidence in support of the [non moving

party's] position will be insufficient [to overcome summary judgment]; there must be evidence on

which the jury could reasonably find for [the non-moving party]." Id. at 252.

## I. Plaintiff's Claims against the Individual Officers

As set forth in detail above, Owen asserts numerous claims under 42 U.S.C. § 1983, and

alleges that individual officers Cordell Pearson, Clark Thomas and Roger Larson violated her

rights under the Fourth and Fourteenth Amendment to the United States Constitution.  (Dkt. No. 3, Compl. at 2.)  The individual officers assert that they are entitled to summary judgment on all of Owen's claims because they are shielded from suit and from liability for any alleged constitutional violation by qualified immunity.

"Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation.  The privilege is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  Saucier v. Katz, 533 U.S. 194, 200-01 (2001).  Consequently, the Supreme Court has emphasized the need to expeditiously resolve "'immunity questions at the earliest possible stage in litigation.'"  Id. (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In determining whether an officer is entitled to qualified immunity, the court engages in a two-step analysis.  The court first asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  If the officer's conduct did not violate a constitutional right, the inquiry ends and the officer is entitled to qualified immunity.  See id.  However, if a constitutional violation could be made out on a favorable view of the party's submissions, then the court must ask whether the right was clearly established.  Id.  In other words, "[t]he contours of the right must be sufficiently clear

that a reasonable official would understand that what he is doing violates that right." Id. at 202

(internal quotation marks and citation omitted).[3] Although the court will "review the evidence in

the light most favorable to the nonmoving party, the record must clearly demonstrate that the

plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified

immunity." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001) (citations omitted). Using this

two-part standard, the court therefore begins by determining whether plaintiff has demonstrated a

violation of her Fourth Amendment rights.[4]

### A.  The Stop, Initial Detention and Search of the Vehicle

The Fourth Amendment protects the "right of the people to be secure in their persons,

houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV.

_____

[3]The Supreme Court recently clarified that the two-step sequence is not mandatory.
Rather, courts must "exercise their sound discretion in deciding which of the two prongs of the
qualified immunity analysis should be addressed first in light of the circumstances in the
particular case at hand." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009). In this case, the court
uses the Saucier two-step approach.

[4]Aside from merely citing the Fourteenth Amendment in her Complaint, Owen neither
asserted the merits of any Fourteenth Amendment claim nor did she mention the Fourteenth
Amendment in oral argument or in her opposition to defendants' motions for summary judgment.
Moreover, all of the causes of action raised by Owen (i.e., unlawful detention, unlawful search,
unlawful arrest, and excessive force) fall within the confines of the Fourth Amendment. Graham
v. Connor, 490 U.S. 386, 394-96 (1989). With specific regard to claims of excessive force, the
United States Supreme Court, in Graham v. Connor, 490 U.S. 386, 394-96 (1989), held that all
claims that law enforcement officers have used excessive force – deadly or not – in the course of
an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the
Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due
process" approach. Id. "Because the Fourth Amendment provides an explicit textual source of
constitutional protection against this sort of physically intrusive governmental conduct, that
Amendment, not the more generalized notion of "substantive due process," must be the guide for
analyzing these claims." Id. at 396. Therefore, to the extent any of plaintiff's claims are
premised on the Fourteenth Amendment, they are hereby dismissed. The standards established
by the Fourth Amendment govern this dispute.

"[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." Wilson v. Arkansas, 514 U.S. 927, 931 (1995). It is well established that a traffic stop and investigative detention, such as the one at issue in this case, is a seizure within the meaning of the Fourth Amendment. United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995), cert. denied, 518 U.S. 1007 (1996). The reasonableness of such a stop is reviewed under a two-part test set forth in Terry v. Ohio, 392 U.S. 1, 20 (1968). Under that test, the court must make a dual inquiry asking first whether the officer's action was justified at its inception and second, whether it was reasonably related in scope to the circumstances which justified the interference in the first place. Id.; United States v. Williams, 271 F.3d 1262, 1266 (10th Cir. 2001), cert. denied, 535 U.S. 1019 (2002).

In this case, Deputy Johnson's stop of the vehicle was justified at its inception. At the time of the traffic stop, the officers knew that Smith, a violent felon with outstanding warrants, had been given permission to drive the white Thunderbird and had driven the vehicle to the Owen residence. The task force officers then drove to the Owen residence where they observed the vehicle and conducted surveillance on the residence and the vehicle prior to observing the vehicle depart. The officers followed the vehicle from the residence, and within a mile Deputy Johnson initiated a traffic stop in order to apprehend Smith on the outstanding warrants. Given these facts, the stop was justified at its inception.[5]

Next, the court must determine whether the officers' actions following the initial stop were

---

[5]Plaintiff appears to concede that the initial stop was lawful, but insists that once Deputy Johnson realized that the driver was not Smith, prior to making any contact with the driver, he was obligated to let the vehicle proceed without any inquiry or further detention. (Tr. at 66, 68-71.)

"reasonably related in scope to the circumstances which justified the interference in the first place." <u>Terry</u>, 392 U.S. at 20. The Supreme Court has made clear that "an investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983.) As explained above, the purpose of the stop in this case was to apprehend Smith on outstanding warrants. Although Deputy Johnson quickly realized upon approaching the vehicle that the driver was not Smith, Deputy Johnson's subsequent actions – briefly detaining the car and driver in order to ascertain Smith's location and whether Smith might be hiding within the vehicle – were consistent with the purpose of the initial stop. To accomplish that purpose, Deputy Johnson asked Owen to exit the vehicle and escorted Owen to Detective Thomas who immediately asked, "Where's Smith?" (County Defs.' Ex. J, Video.) Deputy Johnson and Cordell Pearson then returned to the vehicle to look for Smith. While Deputy Johnson and Cordell Pearson searched the vehicle, detectives Thomas and Larson inquired of Owen as to Smith's whereabouts. The court finds that given these facts, the officers' actions in quickly searching the vehicle for Smith and concurrently asking Owen about Smith's location were "reasonably related in scope to the circumstances which justified the interference in the first place," and therefore not in violation of the Fourth Amendment.

To the extent plaintiff appears to challenge the search of the vehicle, the court finds plaintiff lacks standing. "Fourth Amendment rights are personal and cannot be asserted vicariously." <u>United States v. Arango</u>, 912 F.2d 441, 445 (10th Cir. 1990), <u>cert. denied</u>, 499 U.S. 924 (1991). In the context of a vehicle search, the United States Court of Appeals for the Tenth

Circuit has explained that the mere possession of a vehicle is insufficient to establish standing to challenge the search of that vehicle.  Id. at 444.  Rather, to establish standing, Owen must show that she had "a legitimate possessory interest in or lawful control of the car."  United States v. Valdez Hocker, 333 F.3d 1206, 1209 (10th Cir. 2003).   "At a minimum," Owen must establish "that [s]he gained possession from the owner or someone with authority to grant possession.'" United States v. Valdez Hocker, 333 F.3d 1206, 1209 (10th Cir. 2003).  In this case, it is undisputed that Owen did not own the vehicle, and she has never alleged that she gained possession from the owner or someone with authority to grant possession.  Accordingly, Owen lacks standing to challenge the search of the white Thunderbird.  Moreover, even if Owen had standing to challenge the search, given the facts presented in this case, the court finds that the officers were justified in conducting a relatively brief search in order to determine whether Smith might be hiding somewhere inside the vehicle.

Having determined there was no Fourth Amendment violation resulting from the initial stop, detention and search of the vehicle, the officers are entitled to qualified immunity with regard to plaintiff's first cause of action.

**B.  The Continued Detention and Arrest**

Next, Owen claims that the officers impermissibly detained her beyond the initial purpose of the stop, and therefore her continued detention and resulting arrest were in violation of the Fourth Amendment.  As previously explained, after stopping the vehicle, the officers were justified in briefly detaining Owen and asking questions concerning the whereabouts of Smith while other officers searched the vehicle.  During the course of that lawful, initial detention, Owen's verbal

responses and physical behavior caused the officers to suspect that additional criminal conduct was occurring.

The Tenth Circuit has routinely held that "officers properly investigating one offense are not required to ignore suspicious circumstances suggesting other kinds of offenses."  United States v. Galindo-Gonzalez, 142 F.3d 1217, 1222 (10th Cir. 1998); United States v. Espinoza, 782 F.2d 888, 891 (10th Cir. 1986) (providing that police officers need not close their eyes to suspicious circumstances).  And, "[a]n investigative detention may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity."  United States v. Villa-Chaparro, 115 F.3d 797, 801-02 (10th Cir.), cert. denied, 522 U.S. 926 (1997). In this case, immediately following the stop, and upon making contact with Owen, the officers began to develop reasonable suspicion of additional criminal activity.

Within seconds of making contact with Owen, the officers reasonably believed that Owen was attempting to obstruct justice by concealing or hindering the apprehension of Smith through her dishonest responses to officer questioning.[6]  First, the officers knew Owen's responses were

---

[6]Section 76-8-306 of the Utah Code is titled "Obstruction of justice in criminal investigations or proceedings – Elements – Penaties – Exceptions."  It provides, in pertinent part:
(1) An actor commits obstruction of justice if the actor, with intent to hinder, delay or prevent the investigation, apprehension . . . or punishment of any person regarding conduct that constitutes a criminal offense:
 . . .
  (b) prevents by . . . deception, any person performing any act that might aid in the discovery, apprehension, prosecution, conviction or punishment of any person;
 . . .
  (e) harbors or conceals a person;

not truthful because they were inconsistent.  At one time Owen said she dropped off Smith "out by Gunnison," and within seconds she changed her story and said she left Smith "by the salt mine . . . in Redmond."  (Thomas Dep. 28.)  Given these inconsistencies, the officers knew she was not being truthful.  More significantly, however, the officers had been conducting surveillance on the Owen residence and had followed the vehicle from the residence to the location of the traffic stop.  Based on this surveillance, combined with the information they received from Ms. Hampton, the officers had good reason to believe that Smith was not at either of the locations identified by Owen, but rather was inside the vehicle or at the Owen residence.  Thus the officers had, at the very least, reasonable suspicion to believe that Owen was obstructing justice in violation of Utah Code § 76-8-306.

Additionally, and perhaps more importantly in this case, as the officers observed and interacted with Owen, they noticed objective facts which caused each of them to believe, independently, that she was under the influence of a chemical stimulant.  The undisputed facts indicate that while detectives Thomas and Larson were interviewing Owen, they noticed Owen's eyes were darting back and forth, she exhibited "extreme bruxism," and she experienced involuntary facial twitches.  (Thomas Dep. 34, 54; Larson Dep. 44, 100.)  Additionally, the detectives noted that Owen was fidgeting and shifting her weight back and forth from one foot to the other.  (Id.)  Detective Thomas and Detective Larson both have significant training and experience in identifying drug use and symptomology.  (Thomas Dep. 8; Larson Dep. 99, 112.)

------

(f) provides a person with transportation . . . or other means of avoiding discovery or apprehension . . . .
Utah Code Ann. § 76-8-306(1)(a), (b), (e) & (f).

Given their training and experience, combined with Owen's conduct and appearance, the detectives developed reasonable suspicion that Owen was under the influence of a chemical stimulant. These facts, combined with Owen's efforts to obstruct justice, provided sufficient justification for a prolonged detention beyond the justification for the initial stop.

From this lawful prolonged detention, probable cause to arrest developed when Owen refused to participate in a field sobriety test. In <u>Wilder v. Turner</u>, 490 F.3d 810 (10th Cir. 2007), the Tenth Circuit explicitly provided that a suspect's refusal to take a field sobriety test, combined with other indicators of impairment, provides probable cause to arrest on the basis of DUI. <u>Id.</u> at 815 (reversing district court's denial of qualified immunity and holding that officer who observed indicators of alcohol consumption had probable cause to arrest driver for DUI after driver refused to submit to field sobriety test); <u>see also</u> <u>Summers v. Utah</u>, 927 F.2d 1165 (10th Cir. 1991). According to the <u>Wilder</u> court, "[a] contrary conclusion would simply allow a driver to 'escape arrest simply by refusing to cooperate.'" <u>Id.</u> (quoting <u>Miller v. Harget</u>, 458 F.3d 1251 (11th Cir. 2006)). Given the undisputed facts in this case, and the well-established law in the Tenth Circuit, the officers had probable cause to arrest Owen for DUI.

Because Owen's continued detention and arrest were not in violation of the Fourth Amendment, the officers are entitled to qualified immunity on these claims as well.

## C. Excessive Force – Use of Catheter

Next, Owen claims that the officers used excessive force, in violation of her Fourth Amendment rights, when they used a catheter to obtain a urine sample. Courts analyze Fourth Amendment excessive force claims under the framework established by the Supreme Court in

Graham v. Connor, 490 U.S. 386 (1989). The basic test under Graham is one of objective reasonableness. This requires courts to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake." Id. at 396. In doing so, "[t]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. The Supreme Court cautions that the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. In order for an officer's conduct to amount to excessive force, the conduct must be reckless as opposed to merely negligent. Medina v. Cram, 252 F.3d 1124, 1132 (10th Cir. 2001). Finally, the reasonableness standard "does not require that officers use alternative less intrusive means." Id. at 1133; see also Hunter v. Bryant, 502 U.S. 224, 228 (1991) (providing that immunity does not depend on whether another reasonable or more reasonable course of action was available). Applying this standard, the court concludes that officers' conduct in obtaining a urine sample via catheterization was objectively reasonable under the circumstances in this case.

As an initial matter, the court finds it significant that after Owen initially refused to voluntarily provide a urine sample, the officers did not immediately resort to forced catheterization. Rather, at that point the officers began a relatively laborious process of trying to talk Owen into voluntarily complying with their request. As part of their numerous attempts to encourage Owen to comply, the officers informed Owen that she had been arrested for DUI and because of that they needed to get a urine sample. (Larson Dep. 53.) When Owen continued to

refuse, the officers explained that if she would not comply, they would get a warrant to compel her compliance.  (Larson Dep. 53.)  When she continued to refuse, the officers did, in fact, obtain a bodily fluids warrant and showed it to Owen, explaining "you really don't have a choice . . . this is a warrant from a judge, you have to provide a urine sample."  (Larson Dep. 80.)  Again, Owen refused, and although the officers already possessed a bodily fluids warrant, they did not immediately catheterize Owen.  Instead, out of an abundance of caution, the officers returned to the warrant-issuing Judge to confirm that the warrant authorized taking urine via catheterization. (Larson Dep. 82.)  It was not until the officers had received both a written warrant and follow-up confirmation from the issuing Judge that the officers made the decision to catheterize Owen. See United States v. Leon, 468 U.S. 897, 921 (1984) (providing an officer's reliance on a search warrant is presumptively reasonable and explaining that "an officer cannot be expected to question the [judge's] probable cause determination . . . .  Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law").

Additionally, once the officers realized that in order to obtain a urine sample they would have to do it forcibly, via catheter, the officers ensured that the procedure was done appropriately. In addition to securing a warrant and obtaining verbal authorization from the issuing judge, the officers made certain that the procedure was done by a medical professional.  The officers and jail staff provided as much privacy as Owen would allow given her combative behavior, and they used the minimal amount of force and restraint necessary to execute the bodily fluids warrant.

Finally, the court finds it noteworthy that the ability to avoid what Owen now claims amounted to "excessive force" always remained within Owen's control.  The voluntary providing

of a urine sample is a completely non-invasive and minimally intrusive procedure.  The undisputed

facts demonstrate that at all times during the encounter Owen had both the capacity and repeated

opportunity to comply with the officers' requests and to provide a urine sample in a completely

non-invasive manner.  Owen's voluntary compliance would have obviated the need to use

*any* amount of force, but Owen chose to not comply.

For these reasons, the court concludes that the officers did not use excessive force in

violation of Owen's Fourth Amendment rights, and therefore defendants' are entitled to qualified

immunity on Owen's claim of excessive force.[7]

### 1.  No Clearly Established Law

However, even if the court were to have concluded that the involuntary catheterization of

Owen was not objectively reasonable and therefore a constitutional violation, in order to defeat the

individual defendants' motion for summary judgment based on qualified immunity Owen would

still be required to satisfy the second part of the Saucier test – to show that the law was clearly

established at the time of the violation.

To assess whether the right was clearly established, the court must ask if "the right [was]

---

[7]Although Owen claims that immediately before she was catheterized she asked Nurse
Beutler, "Why can't you just take my blood?"(Owen Dep. 60), Nurse Beutler expressly testified
in her deposition that "[Owen] did not ask me to take a blood sample."  (Beutler Dep. 19.) And,
aside from that single statement in Owen's deposition, the record is completely void of any
evidence that Owen ever requested or consented to a blood test.  More importantly, however,
even if the evidence supported Owen's claim that she requested a blood test, it would not yield a
different outcome.  It is well established that the reasonableness standard does not require
officers to use "alternative less intrusive means," Illinois v. LaFayette, 462 U.S. 640, 647-48
(1983); Medina v. Cram, 252 F.3d 1124, 1132 (10th Cir. 2001), and the United States Supreme
Court has "repeatedly refused to declare that only the least intrusive search practicable can be
reasonable under the Fourth Amendment," Verona School Dist. 47J v. Acton, 515 U.S. 646, 663
(1995).

sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Medina 252 F.3d at 1128. "A right is 'clearly established' if Supreme Court or Tenth Circuit case law exists on point or if the clearly established weight of authority from other circuits found a constitutional violation from similar actions." Peterson v. Jensen, 371 F.3d 1199, 1202 (10th Cir. 2004). While the facts of the cases compared need not be identical, Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004), they must be sufficiently analogous to satisfy the particularized context necessary to support liability. Mecham, 500 F.3d at 1206. In other words, the unlawfulness of the action must be apparent in light of the pre-existing law such that "the state of the law [at the time of the incident] gave the [defendants] fair warning that their conduct was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002); see also Gross v. Pirtle, 245 F.3d 1151, 1155 (10th Cir. 2001) (stating that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"). Accordingly, the relevant question in this case is whether the officers had fair warning on December 27, 2004, that when presented with an individual arrested for DUI, who was capable of but refused to provide a voluntary urine sample, the use of a catheter, pursuant to a written warrant and subsequent clarification of the written warrant by the issuing judge, was unreasonable under the Fourth Amendment.

In support of her claim that the law prohibiting forced catheterization was clearly established, Owen relies on the United States Supreme Court decision in Winston v. Lee, 470 U.S. 753 (1985), and the United States Court of Appeals for Tenth Circuit decision in Yanez v. Romero, 619 F.2d 851 (10th Cir. 1980). Having carefully considered these cases, however, the court does not believe that the precedent cited by Owen would have given the officers fair warning

that catheterizing Owen under the aforementioned circumstances was unreasonable.

As an initial matter, the Supreme Court in <u>Winston</u> did not address or even discuss the issue of forced catheterization. Rather <u>Winston</u> concerned the surgical removal of a bullet under general anesthesia, under conditions in which there was uncertainty as to the safety of the operation, and no compelling need to obtain the bullet in light of other available evidence. <u>Winston</u>, 470 U.S. at 766. And, although the Court deemed the surgical procedure under those circumstances to be unreasonable, the <u>Winston</u> Court expressly affirmed its prior decision in <u>Schmerber v. California</u>, 384 U.S. 757 (1966), which held that state officers may, over a suspect's protest, have a physician extract blood from a DUI suspect without violating the Fourth Amendment. <u>See</u> <u>Winston</u>, 470 at 762. In attempting to make a distinction between these different but nonetheless invasive procedures, the Court expressly recognized that "[t]he reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach . . . . In a given case, the question of whether the community's need for evidence outweighs the substantial privacy interests at stake is a delicate one admitting few categorical answers." <u>Id.</u> at 760. While the Court in <u>Winston</u> concluded that under the <u>Schmerber</u> balancing test the surgical removal of a bullet was unconstitutional, the Court gave no indication as to how this same test might apply to involuntary catheterization under facts similar to the present case, and therefore it could not serve to put the defendant officers on notice that their conduct was constitutionally prohibited. <u>See also</u> <u>Sparks v. Stutler</u>, 71 F.3d 259, 261 (7th Cir. 1995) (recognizing that a "catheter is more intrusive than a needle but less intrusive than a scalpel," making the procedure "difficult to classify under an objective reasonableness inquiry" and finding that "the existence of such line-drawing

problems calls for immunity" as the "rule should be established prospectively rather than at the expense of public employees who predict the development of the law incorrectly").

Similarly, Owen's reliance on the Tenth Circuit's opinion in Yanez v. Romero, 619 F.2d 851 (10th Cir. 1980), is also misplaced. Although Owen correctly quotes the Tenth Circuit as stating "we consider the forceful use of the catheter to obtain a body fluid to be a gross personal indignity," this statement is merely dicta as the issue of involuntary catheterization was not before the court. Id. at 855. Moreover, the actual holding in Yanez was in favor of the police officers, and provided that threats by police officers to use a catheter if the defendant did not voluntarily produce a urine sample did not deprive the defendant of due process. Id. at 854-56. Additionally, the Tenth Circuit in Yanez expressly recognized that there is a "surprising dearth of authority on this subject," which further indicates that the law regarding this issue is not clearly established. Id. at 856. Finally, while this court generally agrees with the Tenth Circuit that forced catheterization is a "gross personal indignity," that does not mean that it is per se unreasonable under all circumstances, nor does it provide sufficient support for plaintiff's claim that the law is well established on this point.

To the extent Owen's claim can be understood as relying on a memorandum decision by Judge K.L. McIff from Utah's Sixth Judicial District Court in Sevier County, it is likewise unavailing. First, Judge McIff's decision in State of Utah v. Marty Hal Dickinson, Case No. 1600202, is irrelevant for purposes of determining whether a right has been clearly established for qualified immunity purposes as it has no bearing on federal law or federal constitutional jurisprudence. See Peterson v. Jensen, 371 F.3d at 1202 (for a right to be clearly established there

must be Supreme Court or Tenth Circuit case law on point or the weight of authority from other circuits). Moreover, even if the case were within the relevant body of law, the facts of <u>Dickinson</u> are not "sufficiently analogous to satisfy the particularized context necessary to support liability." <u>Mecham</u>, 500 F.3d at 1206. For example, <u>Dickinson</u> appears to have involved a suspect who both agreed to and attempted to comply with the officers' request for a urine sample, but was forcefully catheterized in any event because the officers determined the amount of urine voluntarily produced was insufficient. (Dkt. No. 3, Compl. Ex. 1 at 9-10.) Additionally, Judge McIff expressly acknowledged the limited precedential value of <u>Dickinson</u>:

> This holding should not be construed as reposing in any defendant a right of choice, nor should it be considered as requiring officers to employ the least restrictive method, nor that only one method would be acceptable in a given case. Each case must be independently evaluated; the officers must make reasonable choices based upon the circumstances.

(Compl. Ex. 1 at 12.) Finally, and perhaps most significantly, Judge McIff's decision demonstrates that the issue of forced catheterization is unsettled even within the Sixth Judicial District Court for the State of Utah. The fact that Utah's Sixth Judicial District Court in Sevier County had two judges during the relevant time with differing opinions regarding forced catheterization (e.g., Judge Mower who signed the warrant in this case and Judge McIff who authored <u>Dickinson</u> and granted Owen's motion to suppress) does more to undermine rather than support Owen's claim that the right was clearly established.

Based on the foregoing, the court finds that Owen has failed to identify any cases – whether from the United States Supreme Court, the Tenth Circuit or the weight of authority from other circuit courts – that would have put the officers on notice that catheterizing Owen after obtaining express judicial approval and pursuant to a bodily fluids warrant would be unreasonable.

Because Owen has failed to demonstrate that the officers' actions were prohibited by clearly established law, the officers are entitled to qualified immunity on this claim.  Cf. Sparks v. Stutler, 71 F.3d 259 (7th Cir. 1995) (providing prison guard and physician were entitled to qualified immunity in inmate's civil rights action for violating inmate's civil rights since the right to be free from having a catheter inserted was not "clearly established" at the time of procedure).

## II.  Plaintiff's Claims Against the County Defendants

In addition to the individual defendants, Owen also seeks relief from Sheriff Phil Barney and Sergeant Allen Pearson, in their official capacities,[8] Sevier County, and the Central Utah Narcotics Task Force.  Owen alleges that these county defendants (1) failed to adequately train the officers, which resulted in her forced catheterization, and (2) maintained a blanket strip search policy, which resulted in her unlawful strip search. (Compl. at 18-24.)

It is well established that "a municipality may not be held liable where there was no underlying constitutional violation by any of its officers."  City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).  And, even if the municipality's individual officers committed a constitutional violation, "[a] municipality may not be held liable under [section] 1983 solely because its employees inflicted an injury on the plaintiff."  Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993).  Rather, "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue."  City of Canton v. Harris, 489 U.S. 378, 385 (1989).  Accordingly, to establish municipal liability a plaintiff must show "(1) the existence of a

---

[8]"A suit against individual defendants in their official capacities is essentially the same as a suit against the County."  Barney v. Pulsipher, 143 F.3d 1299, 1307 n.4 (D. Utah 1998) (citing Monell v. Department of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)).

municipal policy or custom, and (2) that there is a direct causal link between the policy or custom and the injury alleged." Hinton, 997 F.2d at 682. Moreover, the municipal custom or policy must operate as the "moving force" behind the violation. Bd. of County Comm'rs v. Brown, 520 U.S. 397, 399 (1997). Applying these principles, the court concludes that Owen's claims against the county defendants are insufficient to withstand summary judgment.

**1. Alleged Failure to Train Regarding Catheterization**

As explained in detail above, the court has already determined that Owen failed to set forth facts sufficient for a jury to conclude that the individual officers committed a fourth amendment violation when she was forcibly catheterized. Thus, because there is no underlying constitutional violation, the county defendants cannot be liable on this claim, and summary judgment is appropriate. See Heller, 475 U.S. at 799 ("[I]t is 'inconceivable' to hold the municipality liable if its officers inflict no constitutional harm, regardless of whether the municipality's policies might have 'authorized' such harm."). However, even if the court had found that the forced catheterization was a deprivation of Owen's constitutional rights, Owen has presented insufficient evidence to show that the county had a policy or custom permitting its officers to forcibly catheterize individuals in violation of federal law.

While the failure to properly train police officers can create a custom or policy for purposes of § 1983 liability, it must be tantamount "to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 385 (1989). In other words, the failure to train must "reflect [] a 'deliberate' or 'conscious' choice by a municipality." Id. at 389. In support of this claim, Owen appears to allege that after Sevier County Judge McIff

issued the <u>Dickinson</u> decision, which found the forced catheterization at issue in that case to be a due process violation, the county failed to train its officers that forced catheterization was prohibited. (Dkt. No. 3, Compl. at 13.) However, as previously explained, <u>Dickinson</u> was expressly limited to its facts, and could not therefore have informed the defendants that forced catheterizations were prohibited under all circumstances. More importantly, the relevant federal law has not definitively spoken on the issue of forced catheterization and this court has already concluded that the law in this area is not clearly established. Accordingly, given the unsettled nature of this area of law, Owen's evidence, in the form of a single judicial decision from Utah's Sixth Judicial District Court in Sevier County, is hardly sufficient to show that the county defendants failed to properly train the officers and that such failure rose to the level of deliberate indifference. Because Owen has not shown a direct causal link between the alleged unlawful catheterization and any custom or policy of Sevier County, the county defendants are entitled to summary judgment on this claim.

### 2. Alleged Unlawful Strip Search Policy

With regard to the alleged strip search, although Owen has failed to set forth facts sufficient to state a claim against any individual defendant, the municipal defendants are willing to concede, for summary judgment purposes only, that Owen was strip searched.[9] (Tr. at 86.)

---

[9]Owen claims that she was strip searched by an unidentified female employee upon her arrival at the jail. (Owen Dep. 54.) However, aside from Owen's deposition testimony, there is no evidence that a strip search occurred. Sevier County Jail Lieutenant Pam Bigelow, a female officer on duty that night, testified that she was not involved in a strip search of Owen (Bigelow Dep. 15-16), and Lieutenant Bigelow has been dismissed from this lawsuit. (Tr. at 21-23.) Similarly, Deputy Johnson, who transported Owen to the jail, does not recall ordering a strip search of Owen and was not involved in a strip search at the jail. (Johnson Dep. 33.) Detective Larson did not request a strip search of Owen and was not aware of any member of the task force

However, even assuming a strip search occurred, and assuming *arguendo* that it amounted to a constitutional violation, Owen's claim fails nonetheless because she has failed to show a causal link between a Sevier County policy and the violation of her rights. Owen's unsupported allegation that Sevier County had an unconstitutional "blanket strip search policy" is insufficient to withstand the county defendants' evidence to the contrary. Sheriff Barney, in his Second Affidavit, clearly states there was no blanket strip search policy in existence during the time in question, and the defendants have produced a number of documents relating to strip search policy, none of which support Owen's allegations. (County Defs.' Ex. K, Second Affidavit of Sheriff Barney.) Because Owen has not presented any evidence that Sevier County maintained a policy or custom that authorized blanket strip searches, and because Owen cannot demonstrate a "causal link" between any municipal policy and her alleged violated right, the county defendants are entitled to summary judgment on this claim. See Hinton, 997 F.2d at 682.

### III. Plaintiff's Claim for Malicious Prosecution

Finally, all of the defendants seek summary judgment on Owen's claim for malicious prosecution. According to Owen, the essential elements of malicious prosecution have been met in this case because (1) a prosecution was instituted against Owen, (2) without probable cause, and (3) it terminated in her favor. (Compl. at 25.) However, Owen's malicious prosecution claim suffers from a number of deficiencies, not the least of which is the fact that the court is unable to decipher against whom the claim is brought. Owen's claim does not appear to be brought against any individual, as it does not identify any individual responsible for initiating the criminal

requesting a strip search. Moreover, Detectives Larson and Thomas were not at the jail when Owen was booked and allegedly searched. (Larson Dep. 51, 92.)

proceedings. Similarly, Owen does not identify or allege any policy or custom necessary to support a claim against the municipal defendants. (See Dkt No. 3, Plaintiff's Compl. at 12, 25.) But even looking at the substance of Owen's malicious prosecution claim, it falls short.

In the Tenth Circuit, to succeed on a section 1983 claim for malicious prosecution plaintiff must satisfy the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was no probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages. Novitsky, 491 F.3d at 1258 (citing Pierce, 359 F.3d at 1291-1297.). These elements are only the "starting point" of the analysis, however, as the "ultimate question is whether plaintiff has proven the deprivation of a constitutional right." Novitsky v. City of Aurora, 491 F.3d 1244, 1257-58 (10th Cir. 2007). Viewing the facts in the light most favorable to Owen, no reasonable jury could find that all of these elements are met.

Most significantly, Owen's complaint entirely fails to allege, and her summary judgment opposition materials fail to show, that any of the defendants acted with malice. The malice element required for a malicious prosecution claim requires that criminal proceedings are initiated primarily for a "purpose other than bringing an offender to justice," or at a minimum, some "wrongful or improper motive." Peay v. Utah County, 2009 WL 3152058, *8 (D. Utah Sept. 29, 2009). Because Plaintiff has failed to come forward with any evidence to suggest that the defendants initiated the criminal proceedings against Owen for a purpose other than bringing her to justice, Owen's claim fails as a matter of law, and the defendants are entitled to summary judgment.

**<u>CONCLUSION</u>**

For the foregoing reasons, defendant Roger Larson's Motion for Summary Judgment (Dkt. No. 30) and defendants Cordell Pearson, Clark Thomas, Allen Pearson, Phil Barney, the Central Utah Narcotics Task Force, and Sevier County's Motion for Summary Judgment (Dkt. No. 33) are GRANTED in their entirety.

DATED this 22nd day of July, 2010.

_____
Dee Benson
United States District Judge